955 F.2d 1214
 22 Fed.R.Serv.3d 975
 Viviana McCALDEN,* Plaintiff-Appellant,
v.
CALIFORNIA LIBRARY ASSOCIATION, City of Los Angeles,
American Jewish Committee, Marvin Hier, Simon
Wiesenthal Center, Inc., Westin Hotel
Company, dba Westin
Bonaventure Hotel,
Defendants-
Appellees.
 No. 88-5727.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted May 3, 1989.
Decided Nov. 20, 1990.
As Amended on Denial of Rehearing and Rehearing En Banc Jan. 24, 1992.
 
 Bruce B. McKee, San Francisco, Cal., for plaintiff-appellant.
 Christine W.S. Byrd, Jones, Day, Reavis & Pogue, Los Angeles, Cal., for defendant-appellee California Library Ass'n.
 Marcia Kamine, Deputy City Atty., Los Angeles, Cal., for defendant-appellee City of Los Angeles.
 Michael F. Sitzer, Loeb & Loeb, Los Angeles, Cal., for defendant-appellee American Jewish Committee.
 Clay Robins III, Chase, Rotchford, Drukker & Bogust, Los Angeles, Cal., for defendant-appellee Westin Hotel Co.
 Jeffrey N. Mausner, Laurence M. Berman, Berman, Blanchard, Mausner & Kindem, Los Angeles, Cal., for defendants-appellees Simon Wiesenthal Center and Marvin Hier.
 ORDER AND AMENDED OPINION
 Appeal from the United States District Court for the Central District of California.
 Before FLETCHER, D.W. NELSON and NORRIS, Circuit Judges.
 
 ORDER
 
 1
 The Opinion, filed November 20, 1990, is amended as follows:
 
 
 2
 Judge Fletcher, as dissenter, neither joins in nor opposes the amendment to the majority opinion contained in this order.
 
 
 3
 With the above amendments, the panel has voted unanimously to deny the petition for rehearing and to reject the suggestion for a rehearing en banc.
 
 
 4
 The full court has been advised of the suggestion for en banc rehearing, and a judge in active service requested that a vote be taken on the suggestion for rehearing en banc. Fed.R.App.P. 35(b).
 
 
 5
 Upon the vote of the eligible judges in active service, a majority failed to vote for en banc rehearing. Judge Kleinfeld entered upon active service after the requisite date and was not eligible to vote.
 
 
 6
 The petition for rehearing is DENIED, and the suggestion for a rehearing en banc is REJECTED.
 
 OPINION
 NORRIS, Circuit Judge:
 
 7
 Appellant David McCalden filed an eight-claim second amended complaint alleging breach of contract, tortious interference with contract, deprivation of constitutional rights, and violation of California's Unruh Civil Rights Act. The district court dismissed the complaint under Fed.R.Civ.P. 12(b)(6) for failure to state a claim. McCalden appeals.
 
 
 8
 According to the allegations of his complaint, appellant is a member of an organization that engages in research, writing, publication and discussion questioning the historical accuracy of the accepted portrayal of the Holocaust. In July 1984, appellant entered into a contract with appellee California Library Association ("CLA") to rent exhibit space at the association's annual conference scheduled for December 1984 at the Westin Bonaventure Hotel in Los Angeles. Appellant described the exhibit on his application form as one of "Publishers of revisionist, libertarian and atheist research. Specializing in the defense of civil liberties for unpopular causes."
 
 
 9
 In August 1984, appellant entered into an additional written contract with appellee CLA for the presentation of a program entitled "Free Speech and the Holocaust--An overview from several speakers of the severe censorship and intellectual terrorism which inhibits any objective, open discussion of this controversial subject" at the same conference.
 
 
 10
 After appellant entered into the contracts with CLA, appellees allegedly engaged in a series of acts designed to prevent him from presenting his proposed exhibit and program. He alleges that appellee American Jewish Committee ("AJC") contacted representatives of the CLA and informed them that if appellant's contracts were not cancelled, the conference would be disrupted, property would be damaged, and the CLA would be "wiped out." Appellee City of Los Angeles ("City"), acting through its City Council, passed a unanimous resolution to request that the CLA remove appellant from the conference and to sever the City's participation with the conference. This resolution was allegedly based upon representations of Councilman Yaroslavsky at the specific request of one of his constituents, appellee Rabbi Marvin Hier. In addition, the Los Angeles Police Department informed the Director of the CLA that it had received threats against his life if he allowed appellant to participate in the conference. The City also informed the Director that it would be unable to provide adequate police protection or security measures for the conference.
 
 
 11
 Appellee Simon Wiesenthal Center, at the direction of Rabbi Hier and with the approval of the AJC, allegedly rented a conference room from appellee Westin Bonaventure Hotel which was adjacent to the room in which appellant's program was scheduled to take place. Appellant alleges that the principal reason Simon Wiesenthal Center rented the adjacent room was to position itself so as to disrupt his program. He also alleges that Westin Bonaventure Hotel knew the rental of the room to the Simon Wiesenthal Center would constitute a breach of its agreement with appellee CLA to provide adequate security.
 
 
 12
 Appellant alleges that he believes appellees deliberately and in concert caused CLA to cancel its contracts with him, through the application of political pressure and threats.
 
 I. Jurisdiction
 
 13
 Initially, we must determine whether we have jurisdiction to hear this appeal. Appellant must file a notice of appeal within 30 days after entry of judgment. Fed.R.App.P. 4(a)(1). A timely notice of appeal is jurisdictional. Allah v. Superior Court, 871 F.2d 887, 890 n. 1 (9th Cir.1989). Appellees claim that appellant's appeal is untimely.
 
 
 14
 On February 11, 1987, the district court dismissed appellant's first, second, fifth, sixth and seventh claims with prejudice. The court granted leave to amend with respect to the fourth claim, but cautioned that it would "impose sanctions for the filing of a frivolous pleading." Excerpts of Record ("ER") at 15. On March 24, 1987, the district court dismissed the fourth claim with prejudice, because appellant had not amended his complaint within the time allowed. On March 31, 1987, appellant stipulated to dismiss without prejudice his third and eighth claims against the city. With this final stipulation, each of his eight claims had been dismissed. On June 19, 1987, appellant filed a motion requesting the court to enter judgment in his case. On July 30, 1987, the court, in an order, refused to enter judgment on the ground that its former orders constituted entry of judgment. Appellant filed a notice of appeal February 10, 1988.
 
 
 15
 Rule 4(a)(6) provides that the time for appeal does not start running until a judgment is entered in compliance with Rules 58 and 79(a) of the Federal Rules of Civil Procedure, that is, until it is set forth in a separate document and properly entered by the clerk of the court.[1]
 
 
 16
 Appellees argue, and the district court held, that the time for appeal began to run when the court filed the final stipulation on March 31, 1987. The court relied on Anderson v. Allstate Ins. Co., 630 F.2d 677, 680-81 (9th Cir.1980), and Baker v. Limber, 647 F.2d 912, 916 (9th Cir.1981), for authority that a case becomes appealable once all claims against all defendants have been finally dismissed. While it is true that Baker and Anderson are authority for the proposition that appellant's case became appealable on March 31, 1987, and therefore that appellant could have appealed after that date, it does not necessarily follow that the 30-day time period began to run on that date. The time period begins to run only by the entry of a "judgment ... set forth on a separate document."[2] Fed.R.Civ.P. 58. The reason for this rule, so apt in this case, was stated by the Supreme Court in Bankers Trust Co. v. Mallis, 435 U.S. 381, 385, 98 S.Ct. 1117, 1120, 55 L.Ed.2d 357 (1978) (per curiam):
 
 
 17
 The separate-document requirement was ... intended to avoid the inequities that were inherent when a party appealed from a document or docket entry that appeared to be a final judgment of the district court only to have the appellate court announce later that an earlier document or entry had been the judgment and dismiss the appeal as untimely.
 
 
 18
 For purposes of Rule 4(a), in order to make the finality of a case as unequivocal as possible, our circuit has held that the separate-document rule be "mechanically applied," or else a "party will not ordinarily be found to have exceeded any of the time periods [of Rule 4(a) ]." Allah v. Superior Court, 871 F.2d at 890 (quoting Vernon, 811 F.2d at 1276). See also Carter v. Beverly Hills Sav. & Loan Ass'n, 884 F.2d 1186 (9th Cir.1989), cert. denied, --- U.S. ----, 110 S.Ct. 3270, 111 L.Ed.2d 780 (1990) (civil minutes entered in docket book do not constitute final judgment unless separate order filed and all formalities observed).
 
 
 19
 The district court's various orders did not constitute an "entry of judgment" in this case, because no separate document of judgment was entered. Although the district court's July 30 order refusing to enter judgment gave appellant notice that the district court considered his claims to be finally dismissed, the order also suggested, mistakenly, that appellant's time for appeal had already run. Since the very purpose of Rule 4(a) is to avoid confusion, we cannot hold, Magritte-like, that an order stating that "this is not an entry of judgment" is nonetheless an entry of judgment. Our circuit has held fast to a mechanical application of the "separate judgment" rule, requiring all formalities to be observed. See Carter, supra. Therefore, the time for appeal never began to run, and appellant's appeal is timely.
 
 
 20
 We review de novo the dismissal of an action under Rule 12(b)(6) for failure to state a claim. Patee v. Pacific Northwest Bell Tel. Co., 803 F.2d 476, 477 (9th Cir.1986).
 
 II. Breach of Contract Claim
 
 21
 Appellant asserts a state law breach of contract claim against the CLA, claiming that it breached its two contracts with appellant, one for the rental of exhibition space and the second for the rental of a conference room in which appellant planned to present a program expressing his views on the Holocaust. In support of this claim, appellant alleged that the CLA cancelled the contract ostensibly because of threats of disruption to the convention if appellant were allowed to exhibit and speak, but that "the real and only substantial reason for defendant CLA's decision to cancel its contracts with plaintiff was its concern about loss of support ... as a result of action taken by defendant CITY OF LOS ANGELES...." ER at 21. In later claims, however, appellant alleged that the CLA received substantial threats of violence and that the police declined or were unable to provide adequate protection. See, e.g., ER at 23-31.
 
 
 22
 The district court dismissed the breach of contract claim, holding that appellant had pled an impossibility defense to his own claim by his allegations in other sections of the complaint. ER at 4-7. We cannot agree.
 
 
 23
 The issue here is one of alternative pleading. Federal Rule of Civil Procedure 8(e)(2) explicitly provides, in relevant part, that "[a] party may ... state as many separate claims or defenses as the party has regardless of consistency and whether based on legal, equitable, or maritime grounds." Fed.R.Civ.P. 8(e)(2). Our circuit has held that "[i]n light of the liberal pleading policy embodied in Rule 8(e)(2) ... a pleading should not be construed as an admission against another alternative or inconsistent pleading in the same case." Molsbergen v. United States, 757 F.2d 1016, 1019 (9th Cir.), cert. dismissed, 473 U.S. 934, 106 S.Ct. 30, 87 L.Ed.2d 706 (1985). Following Molsbergen and the clear mandate of Rule 8(e)(2) requires that we reverse the dismissal of appellant's breach of contract claim, because the district court's dismissal was based on an impermissibly strict reading of his complaint.
 
 
 24
 In any event, the allegations in appellant's complaint do not plead a complete impossibility defense to his own claim. For a complaint to be dismissed because the allegations give rise to an affirmative defense "the defense clearly must appear on the face of the pleading." 5A C. Wright & A. Miller, Federal Practice and Procedure, § 1357, at 348-49 (2d ed. 1990). A party invoking the impossibility defense must show that he used reasonable efforts to surmount the obstacles which prevented performance. See Oosten v. Hay Haulers Dairy Employees & Helpers Union, 45 Cal.2d 784, 789, 291 P.2d 17, 21 (1955) (defendant invoking impossibility defense required to show affirmatively that performance was impossible or unreasonably expensive despite exercise of skill, diligence and good faith), cert. denied sub nom Knudsen Creamery Co. of California v. Oosten, 351 U.S. 937, 76 S.Ct. 833, 100 L.Ed. 1464 (1956); see also B. Witkin, Summary of California Law § 786 (1987); Restatement (Second) of Contracts § 261 comment (d) (1981). Here, appellant's complaint does not clearly state that the CLA took reasonable measures to obviate the danger from groups that opposed appellant (e.g., by insisting on police protection, hiring extra security guards or instituting special security procedures.) Hence, when we consider the allegations in all sections of the complaint, appellant does not plead a complete impossibility defense. Accordingly, we vacate the dismissal of the breach of contract claim.III. Interference with Contractual Relationship Claim
 
 
 25
 Appellant's second claim alleges that the City, the AJC, Rabbi Hier, the Wiesenthal Center and Westin tortiously interfered with appellant's contractual relationship with the CLA. The district court dismissed this claim with prejudice, holding that this cause of action required the plaintiff to allege that " 'some identifiable pecuniary or economic benefit' accrue[d] to defendants that formerly accrued to plaintiff." ER at 7 (quoting Garter-Bare Co. v. Munsingwear Inc., 723 F.2d 707, 716 (9th Cir.1984)).
 
 
 26
 As we read California law, pecuniary or economic benefit is not an element of the tort of interference with a contractual relationship. A recent California Supreme Court case, which the district court may not have had the benefit of, has not identified this element when listing the essential components of this claim. Pacific Gas & Elec. Co. v. Bear Stearns & Co., 50 Cal.3d 1118, 1126, 270 Cal.Rptr. 1, 791 P.2d 587 (1990) (listing elements which plaintiff must plead to state cause of action for intentional interference with contract, and not including accrual of economic benefit to defendant).[3] Since such benefit is not an essential component of this claim, appellant's failure to plead it does not defeat his claim, which must be reinstated.[4]
 
 IV. Unruh Act Claim
 
 27
 The district court dismissed with prejudice appellant's claim under § 51.7 of the California Civil Code, on the ground that appellant did not fall within a group protected by that statute.
 
 
 28
 Cal.Civ.Code § 51.7(a) as amended in 1984, provides in relevant part, as follows:
 
 
 29
 All persons within the jurisdiction of this state have the right to be free from any violence, or intimidation by threat of violence, committed against their persons or property because of their race, color, religion, ancestry, national origin, political affiliation, sex, sexual orientation, age, disability, or position in a labor dispute. The identification in this subdivision of particular bases of discrimination is illustrative rather than restrictive.
 
 
 30
 The district court found that a group of "Holocaust revisionists" was not a political affiliation under the terms of the statute. However, appellant claims on appeal that he is nonetheless a member of a class that is subject to invidious discrimination, whether or not labeled political, and that because the statute's list is meant to be "illustrative rather than restrictive," he should be protected by it.
 
 
 31
 Appellees argue that the "illustrative rather than restrictive" language on which appellant relies was added to the statute after the events in this case, and was an enlargement of the statute's protections. The limited legislative history of the amendment is ambiguous as to whether it was intended to clarify the section or to alter it. In addition, there is only one published California case that does more than mention § 51.7 in passing, and it does not address the issue raised by the district court here. (Coon v. Joseph, 192 Cal.App.3d 1269, 237 Cal.Rptr. 873 (1987)). The California courts, however, have considered § 51.7 to be a "component" of the earlier-enacted Unruh Civil Rights Act, Cal.Civ.Code § 51. See Long v. Valentino, 216 Cal.App.3d 1287, 1293, 265 Cal.Rptr. 96 (1989) (as modified on rehearing).
 
 
 32
 The Unruh Act, Cal.Civ.Code § 51, prohibits discrimination by business establishments on the basis of sex, race, color, religion, ancestry, or national origin. Despite this more restricted list, and the absence of any legislative statement that the list is not exclusive, the California courts have construed § 51's list of classes as "illustrative rather than restrictive." In re Cox, 3 Cal.3d 205, 216, 474 P.2d 992, 999, 90 Cal.Rptr. 24, 31 (1970). Given that the legislative amendment to § 51.7 tracks this language, and the Cox case was cited in the Assembly Bill analysis,[5] it is reasonable to infer that the amendment was a codification of Cox 's pronouncement. At the very least, the California courts' approach to § 51 guides us in the analysis of § 51.7 as an indication of what the California courts might do in this case. See S & R Metals, Inc. v. C. Itoh & Co., 859 F.2d 814, 816 (9th Cir.1988) (in absence of express guidance, federal court must apply state law as it predicts state's highest court would).
 
 
 33
 The California courts have defined the classes of the Unruh Act very broadly to include "individuals who wear long hair or unconventional dress, who are black, who are members of the John Birch Society, or who belong to the American Civil Liberties Union," In re Cox, 3 Cal.3d at 217-218, 474 P.2d 992, 90 Cal.Rptr. 24 students, families with children, welfare recipients, and occupational groups. Marina Point, Ltd. v. Wolfson, 30 Cal.3d 721, 736, 640 P.2d 115, 124, 180 Cal.Rptr. 496, 505, cert. denied 459 U.S. 858, 103 S.Ct. 129, 74 L.Ed.2d 111 (1982).
 
 
 34
 Appellant describes himself as a member of a class of "Holocaust Revisionists," who are subject to invidious discrimination because they spread unpopular views about the history of the Holocaust. ER 35. Appellees claim that appellant's expulsion from the CLA conference was not due to his being a member of an unpopular group, but was because of his "spreading lies." They argue that lying is conduct, not membership in a group, and therefore appellant does not fall within the protection of the Unruh Act. See Frantz v. Blackwell, 189 Cal.App.3d 91, 96, 234 Cal.Rptr. 178, 181 (1987) (discrimination reasonably based on a person's conduct, as opposed to his status, not prohibited by the Unruh Act; Act aims for individualized treatment).
 
 
 35
 On a motion to dismiss, however, the court must deem the complaint's allegations to be true. Williford v. California, 352 F.2d 474, 475-76 (9th Cir.1965). Appellant alleges that he is a member of a group espousing unpopular views. A John Birch Society or ACLU member could fall in the same kind of class, and the Cox decision is explicit that those groups would receive the protection of the Unruh Act.
 
 
 36
 Appellees also argue that the complaint does not sufficiently allege intimidation by threat of violence committed to plaintiff's person or property, as required by § 51.7. Liberally construed, the complaint contains one allegation of a specific threat--the AJC's alleged statement to the CLA, "at the urging and request and with the knowledge, approval and cooperation of Defendants Marvin Hier ... and Simon Wiesenthal Center" that if the contracts with appellant were not canceled, "[d]efendant CLA's 1984 Annual Conference would be disrupted, there would be damage to property and the CLA would be 'wiped out.' " ER at 23. Appellees claim that this language can be construed only as a threat against the CLA, not against the person or property of appellant. They cite Coon v. Joseph, 192 Cal.App.3d 1269, 237 Cal.Rptr. 873 (1987), in which the court held that the plaintiff, a gay man, could not state a § 51.7 claim against a bus driver by alleging that his lover was verbally abused and struck in his presence. The court stated:
 
 
 37
 The complaint establishes that no violence or intimidation was committed or threatened against [plaintiff's] person and thus no cause of action exists in his own right. Following [plaintiff's] argument, any person would have the right to recover damages for himself or herself whenever the rights of any other human being of similar ... sexual orientation were threatened.
 
 
 38
 Id. at 1277-78, 237 Cal.Rptr. 873.
 
 
 39
 On a motion to dismiss, all reasonable inferences are to be drawn in favor of the non-moving party. United States v. City of Redwood City, 640 F.2d 963, 966 (9th Cir.1981). Appellant alleges that the appellees intended to disrupt his presentation by creating a demonstration that appellees knew and intended "would create a reasonable probability of property damage and of violence against Plaintiff and members of Defendant CLA." ER 10-11. In view of all the facts pled, it is reasonable to infer that any property damage or injury threatened could be directed against appellant, because the allegations clearly link the alleged threat to an intent to disrupt appellant's exhibit and program. This case must therefore be distinguished from Coon, because it can be reasonably inferred from the complaint that the threatened violence was directed against appellant.
 
 
 40
 Although appellees suggest that the statute must be read as requiring the threat to be conveyed directly to the person threatened,[6] the statute requires only that the plaintiff be intimidated by threat of violence committed against his person or property. In construing a remedial state statute, on a motion to dismiss, in the absence of clear state court direction, this court is reluctant to read any unnecessary restrictions into § 51.7.
 
 
 41
 Finally, some appellees raise a First Amendment defense to this cause of action, arguing that there can be no liability for alleged threats of violence unless they were "directed to inciting or producing imminent lawless action." Brandenburg v. Ohio, 395 U.S. 444, 447, 89 S.Ct. 1827, 1829, 23 L.Ed.2d 430 (1969) (per curiam); NAACP v. Claiborne Hardware Co., 458 U.S. 886, 927, 102 S.Ct. 3409, 3433, 73 L.Ed.2d 1215 (1982). We reject this argument. Both Brandenburg and Claiborne involved public speeches advocating violence, not privately communicated threats of violence as are alleged here. Privately communicated threats have traditionally been punishable where they have "a reasonable tendency to produce in the victim a fear that the threat will be carried out." Wurtz v. Risley, 719 F.2d 1438, 1441 (9th Cir.1983).
 
 
 42
 That appellees were engaging in protected expressive activities at the same time and to the same end as the alleged threats of violence does not immunize appellees from liability for the alleged threats. In Claiborne, the Court held that NAACP official Charles Evers could not be held liable for a public speech, but the Court stated unequivocally that individuals who "engaged in violence or threats of violence ... may be held responsible for the injuries that they caused." Claiborne, 458 U.S. at 926, 102 S.Ct. at 3432. Nor does the fact that appellees were politically motivated immunize them from liability if they in fact engaged in threats of violence. The boycotters who threatened and engaged in violence in Claiborne were no less politically motivated than Charles Evers whose public speech the Supreme Court held to be protected by the First Amendment. Id.; see also Rankin v. McPherson, 483 U.S. 378, 386-87, 107 S.Ct. 2891, 2898, 97 L.Ed.2d 315 (1987) ("a statement that amounted to a threat to kill the President would not be protected by the First Amendment"). Appellant may not be able to support the allegations in his complaint, but those allegations are sufficient to survive a motion to dismiss.
 
 V. Section 1985(3) Claim
 
 43
 Appellant also asserts a claim under 42 U.S.C. § 1985(3),[7] averring that five of the defendants[8] conspired to deprive him of his civil rights "solely because of his membership in a class known as Holocaust revisionists," a "class" the members of which he claims are subject to invidious discrimination because of their views. ER at 35. We must decide whether appellant's self-identified "class" falls within the ambit of classes § 1985(3) has been interpreted to protect.[9]
 
 
 44
 Building upon the Supreme Court's jurisprudence on this issue,[10] our circuit has distilled a rule that to state a claim under § 1985(3) "the plaintiff must be a member of a class that requires special federal assistance in protecting its civil rights." Gerritsen v. de la Madrid Hurtado, 819 F.2d 1511, 1519 (9th Cir.1987); see also Trerice v. Pedersen, 769 F.2d 1398, 1402-03 (9th Cir.1985) (principle underlying § 1985(3) is governmental determination that some groups require and warrant special federal assistance in protecting their civil rights); Schultz v. Sundberg, 759 F.2d 714, 718 (9th Cir.1985) (per curiam) (same); Canlis v. San Joaquin Sheriff's Posse Comitatus, 641 F.2d 711, 720 (9th Cir.) (same), cert. denied, 454 U.S. 967, 102 S.Ct. 510, 70 L.Ed.2d 383 (1981); DeSantis v. Pacific Telephone & Telegraph Co., Inc., 608 F.2d 327, 332-33 (1979) (same). It is against this standard that appellant's claim must be tested.
 
 
 45
 Appellant attempts to fulfill § 1985(3)'s class-based animus requirement by alleging animus against the class of individuals holding particular unpopular historical views. Given our circuit's standard for fulfilling § 1985(3)'s requirement of class-based animus, we cannot accept his argument that the animus against the class of "Holocaust revisionists" satisfies this requirement as our circuit has interpreted it. Appellant makes no argument that Holocaust revisionists have been singled out for special federal protection. We therefore affirm the dismissal of appellant's § 1985(3) claim.
 
 VI. Section 1986 Claim
 
 46
 As appellant himself concedes, "[a] claim can be stated under § 1986 only if the complaint contains a valid claim under § 1985." Appellant's Brief at 60. See, e.g., Karim-Panahi v. Los Angeles Police Dep., 839 F.2d 621, 626 (9th Cir.1988). Thus, our affirmance of the dismissal of appellant's § 1985(3) claim requires us to affirm as well the dismissal of his claim under § 1986.
 
 VII. Section 1983 Claim
 
 47
 In its order of February 11, the district court dismissed appellant's fourth claim without prejudice, on the ground that it failed to state the "Constitutional or statutory basis for the alleged wrong." ER at 10. This claim was dismissed with prejudice on March 24 on the ground that appellant had not attempted to amend his complaint.
 
 
 48
 The district court's February 11 dismissal without prejudice was error. Appellee is not required to state the statutory or constitutional basis for his claim, only the facts underlying it. See Haddock v. Board of Dental Examiners of California, 777 F.2d 462, 464 (9th Cir.1985) (complaint "should not be dismissed if it states a claim under any legal theory, even if the plaintiff erroneously relies on a different legal theory"). Moreover, appellant explicitly mentions 42 U.S.C. § 1983 in the first paragraph of his complaint, which is incorporated by reference in his fourth claim, and his fourth claim tracks the language of § 1983. On remand, the district court should consider whether appellant has stated a claim under § 1983.[11]
 
 
 49
 The City argues that appellant's failure to amend precludes his appeal, because he has, by his silence, acquiesced in the earlier dismissal without prejudice. However, appellant is not required to amend in order to preserve his right to appeal. When one is granted leave to amend a pleading, she may elect to stand on her pleading and appeal, if the other requirements for a final, appealable judgment are satisfied. See 15 C. Wright & A. Miller, Federal Practice and Procedure § 3914 (1976); 3 J. Moore, Federal Practice p 15.11 (2nd Ed.1989).
 
 VIII. Motion for Reassignment
 
 50
 Appellant moves that this case be remanded to a different district judge on the ground that he believes Judge Marshall to be biased against him. As evidence of this alleged bias, appellant complains that the district court 1) mischaracterized his views; 2) intentionally refused to enter judgment in order to delay appellant's appeal; 3) improperly threatened appellant with sanctions in the event that a third amended complaint was frivolous; 4) improperly ordered appellant to show cause why his remaining claims against Los Angeles should not be dismissed, when there was no evidence of lack of prosecution; 5) ignored appellant's application to file documents pending admission of his counsel to practice in the Central District of California; and 6) falsely accused counsel of making an improper communication to the court.
 
 
 51
 Remand by this court to a different district judge, in the absence of proof of personal bias, is granted only in "unusual circumstances." Davis & Cox v. Summa Corp., 751 F.2d 1507, 1523 (9th Cir.1985). In making this determination, we may consider
 
 
 52
 (1) whether the original judge would reasonably be expected upon remand to have substantial difficulty in putting out of his or her mind previously-expressed views or findings determined to be erroneous or based on evidence that must be rejected, (2) whether reassignment is advisable to preserve the appearance of justice, and (3) whether reassignment would entail waste and duplication out of proportion to any gain in preserving the appearance of fairness.
 
 
 53
 Id. (quoting United States v. Arnett, 628 F.2d 1162, 1165 (9th Cir.1979)). Adverse rulings alone are not sufficient to require recusal, even if the number of such rulings is extraordinarily high. Matter of Beverly Hills Bancorp, 752 F.2d 1334, 1341 (9th Cir.1984). The instant case varies markedly from United States v. Jacobs, 855 F.2d 652, 656-57 (9th Cir.1988), cited by appellant. In Jacobs, in addition to making erroneous rulings, the district judge had repeatedly disparaged the movant's case and counsel, and had offered advice to the opponent.
 
 
 54
 The examples of the district court's conduct appellant gives here do not come close to a showing of bias. Appellant's motion for reassignment is denied.
 
 IX. Conclusion
 
 55
 We affirm the district court's dismissal of appellant's claims under § 1985 and § 1986; we reverse the district court's dismissal of the contract, interference with contract, and Unruh Act claims; we vacate the district court's order dismissing the § 1983 claims, and we remand for further proceedings consistent with this opinion. Finally, we deny appellant's motion that the case be remanded to a different district judge.
 
 FLETCHER, Circuit Judge, dissenting:
 
 56
 I respectfully dissent. We should not reach the merits of this appeal. Rule 4 requires that an appellant file a notice of appeal within 30 days after a final judgment has been entered in accordance with Fed.R.Civ.P. 58. Fed.R.App.P. 4(a)(1), (6). Absent a timely filed notice of appeal, we have no jurisdiction. Miller v. Sumner, 872 F.2d 287 (9th Cir.1989); Rodgers v. Watt, 722 F.2d 456 (9th Cir.1983) (en banc).
 
 
 57
 The district court dismissed McCalden's last claim on March 31, 1987, almost a full year before McCalden filed his notice of appeal. Moreover, the district court, by order on July 30, 1987, more than seven months before McCalden filed his appeal, explicitly informed McCalden that the order entered on March 31, 1987 unquestionably and finally disposed of his case and that the court would issue no further judgment. At the very latest, McCalden was obligated to file his notice of appeal within 30 days of this order. McCalden's notice of appeal at a minimum was filed almost six months too late.
 
 
 58
 The majority holds that the 30-day period for filing an appeal never began to run because the district court failed to enter a final judgment that met the requirements of Fed.R.Civ.P. 58. Specifically, the majority finds that the district court failed to set forth its judgment on a separate piece of paper. See Fed.R.Civ.P. 58. This elevates form over policy and, indeed, over all common sense.
 
 
 59
 The purpose of the separate document rule is to ensure that litigants know precisely when a judgment is final. It therefore removes uncertainty about when litigants must file an appeal. See Fed.R.Civ.P. 58 (comment) (separate document requirement instituted to remove uncertainties as to when a judgment is entered); 11 C. Wright & A. Miller, § 2781, at 6 (1973) (describing purpose of Rule 58). The order denying McCalden's request for entry of judgment, entered by the district court on July 30, 1987, fulfills this purpose.[1] It communicates precisely the information that a final judgment is supposed to communicate only it does so explicitly. First, it states that the judgment of the district court with respect to all claims is final. Second, it explicitly denies appellant's request for an entry of judgment, and thereby clearly notified McCalden that no further judgment would issue. Once this order was entered, McCalden knew the district court case was over; he had absolutely no reason to delay filing his appeal. His only possible uncertainty was that he might already be too late.
 
 
 60
 Although the July 30 order does not expressly direct entry of judgment on the dismissed claims, it explains that this has already happened. To find this insufficient, indeed, does inappropriately "elevat[e] ... form over substance." Hamilton v. Nakai, 453 F.2d 152, 155 (9th Cir.1971); see also United States v. Perez, 736 F.2d 236, 238 (5th Cir.1984) (per curiam) ("We are not required to 'mindlessly' apply Rule 58"); Weinberger v. United States, 559 F.2d 401, 402 (5th Cir.1977) (same). In the Supreme Court's words, "[a] pragmatic approach to the question of finality has been considered essential to the achievement of the 'just, speedy, and inexpensive determination of every action ...,' " Brown Shoe Co. v. United States, 370 U.S. 294, 306, 82 S.Ct. 1502, 1513, 8 L.Ed.2d 510 (1962).
 
 
 61
 McCalden knew his July 30, 1987 case was over and that the order was the final piece of paper the district court would enter. He should have filed his notice of appeal not later than August 30, 1987. Yet he waited until February of 1988. We should dismiss the appeal for lack of jurisdiction.
 
 
 62
 KOZINSKI, Circuit Judge, with whom Circuit Judges ALARCON, REINHARDT and T.G. NELSON join, dissenting from the order rejecting the suggestion for rehearing en banc.
 
 
 63
 This is a case of exceptional importance. What began as a political dispute among widely divergent factions has been converted into a lawsuit; thwarted in the political arena, plaintiff McCalden has chosen to continue the battle by dragging his adversaries into court. The fundamental question presented is how much--or rather how little--he need allege before the courts will entertain his case, putting the defendants to the burden, expense and risk of litigation.
 
 
 64
 The answer to this question is of profound significance at a time when civil litigation is anything but the "just, speedy, and inexpensive" process contemplated by the Federal Rules of Civil Procedure. The federal courts have recognized that lawsuits impinging on speech presumptively protected by the First Amendment are subject to far more stringent pleading requirements than ordinary lawsuits, precisely because protected speech is so precious--and so fragile--that it can easily be smothered under piles of document requests, depositions, interrogatories, requests for admission and the other ordnance in the modern litigator's arsenal.
 
 
 65
 McCalden alleges repeatedly that the defendants used "threats of violence" to thwart him, and on that basis alone does the panel majority let him proceed with his lawsuit. Nowhere, however, does McCalden give a single example of an actionable threat of violence. McCalden's only elaboration on his will-o'-the-wisp allegations is that defendants were "threatening and organizing a demonstration which [they] knew and intended would create a reasonable probability of property damages and of violence." Second Amended Complaint p 32 (emphasis added). While genuine threats of violence are not constitutionally protected, I had thought it inconceivable that one could be held liable for planning and organizing a political demonstration. By allowing McCalden to proceed with his lawsuit, my colleagues turn back the clock to the dark days of the not-so-distant past when the judicial process was routinely used to crush opposing viewpoints--an era I, like most observers, believed had ended with Brandenburg v. Ohio, 395 U.S. 444, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969).
 
 Background
 
 66
 McCalden is a Holocaust revisionist. He proselytizes the view that the historical record of Nazis murdering millions of Jews and other civilians on account of their ethnic and religious affiliations is a hoax. In pursuit of his mission, McCalden contracted for exhibit space at the 1984 meeting of the California Library Association, and also planned to give a presentation there.
 
 
 67
 McCalden's efforts did not go over well with those who were victims of the Holocaust, or whose families, friends or co-religionists were subjected to Nazi atrocities. Particularly incensed by McCalden's proposed participation in the conference were the American Jewish Committee, the Simon Wiesenthal Center for Holocaust Studies and the Center's director, Rabbi Marvin Hier (collectively Wiesenthal). McCalden alleges that the Wiesenthal defendants[1] took a series of actions designed to keep him from showing his exhibit or holding his presentation. He sued, raising a variety of state and federal claims; the district court dismissed them all. Rejecting defendants' argument that their activities were protected by the First Amendment, the panel majority lets McCalden proceed on his claims for interference with contractual relations and under California's Unruh Civil Rights Act, and remands for a determination whether McCalden has pleaded facts sufficient to support a claim under a federal civil rights statute, 42 U.S.C. § 1983.
 
 Discussion
 
 68
 A. Civil litigation is a tool for vindicating important rights, but it can also be a bludgeon for striking at political adversaries. See Grunwald v. San Bernardino City Unified School Dist., 917 F.2d 1223, 1232-33 (9th Cir.1990) (Kozinski, J., dissenting). The classic example is New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), where the police commissioner of Montgomery, Alabama, sought to use state libel law to crush press support for the nascent civil rights movement in the South. See generally Anthony Lewis, Make No Law: The Sullivan Case and the First Amendment ch. 5 (1991).
 
 
 69
 In case after case since Sullivan, the Supreme Court and our court have recognized that "the pall of fear and timidity imposed [by the threat of litigation] upon those who would give voice to public criticism is an atmosphere in which the First Amendment freedoms cannot survive." Sullivan, 376 U.S. at 278, 84 S.Ct. at 725; see Oregon Natural Resources Council v. Mohla, 944 F.2d 531, 533 (9th Cir.1991). The uncertainties inherent in our imperfect legal system, coupled with the often staggering out-of-pocket costs of obtaining even a favorable judgment, will necessarily do much to deter expression. See Frederick Schauer, Fear, Risk and the First Amendment: Unraveling the "Chilling Effect," 58 B.U.L.Rev. 685, 687-89, 694-701 (1978).
 
 
 70
 The federal courts have constructed an important series of safeguards to protect First Amendment speakers from such politically motivated litigation. Sullivan established the requirement that public officials plead and prove actual malice in libel cases. 376 U.S. at 279-80, 84 S.Ct. at 726. Bose Corp. v. Consumers Union, 466 U.S. 485, 503-11, 104 S.Ct. 1949, 1961-65, 80 L.Ed.2d 502 (1984), directs the courts of appeals to conduct an independent review of the record. Hustler Magazine, Inc. v. Falwell, 485 U.S. 46, 55, 108 S.Ct. 876, 882, 99 L.Ed.2d 41 (1988), proscribes the use of a subjective standard "which would allow a jury to impose liability on the basis of the jurors' tastes or views, or perhaps on the basis of their dislike of a particular expression." And Franchise Realty Interstate Corp. v. San Francisco Local Joint Executive Board, 542 F.2d 1076, 1082-83 (9th Cir.1976), establishes that "where a plaintiff seeks damages ... for conduct which is prima facie protected by the First Amendment, the danger that the mere pendency of the action will chill the exercise of First Amendment rights requires more specific allegations [in the complaint] than would otherwise be required."
 
 
 71
 McCalden's complaint falls far short of the First Amendment's specificity requirement. He alleges nothing--nothing at all--that could arguably place defendants' speech outside the protective umbrella of the First Amendment: He does not claim that defendants threatened to break anybody's kneecaps, or to plant a bomb, or to have goons set fire to his exhibit. If plaintiff wants to claim that speech uttered by defendants in pursuit of a political objective is extortion, he must allege facts that, if proven, would amount to extortion.[2] One searches McCalden's 24-page complaint in vain for such allegations.
 
 
 72
 The panel majority's offhanded treatment of this as an extortion case is perturbing. If these defendants--operating at the core of the First Amendment--can be subjected to a lawsuit for extortion based on a handful of conclusory allegations, one wonders and worries who else can so easily be dragged into the quagmire of litigation. The press, for example, is a fat target for suits based on vaguely worded complaints alleging "defamation," "invasion of privacy" or some other speech not sheltered by the First Amendment. See Rodney Smolla, Suing the Press (1986). I had thought it inconceivable that a complaint by a public figure claiming nothing more than that he was "libeled with malice" would survive a motion to dismiss under Rule 12(b)(6). See, for example, Barger v. Playboy Enterprises, Inc., 564 F.Supp. 1151, 1154-57 (N.D.Cal.1983). Now I'm not so sure; if "threats of violence" is a talisman that can whisk a complaint past a motion to dismiss, why not "libel" and "malice" as well? My colleagues' utter disregard for the First Amendment's specificity requirement will bring a chill of discomfort to publishers, editors and political commentators subject to suit in the Ninth Circuit.
 
 
 73
 B. But we have here far more than merely the absence of specific allegations of unprotected speech: The speech McCalden does specifically allege is fully protected. McCalden's lengthy complaint makes it clear that he and the Wiesenthal defendants were locked in an intense political struggle, waged through the normal political channels: "[T]he sole purpose of [the Wiesenthal defendants'] action was to induce Defendant CLA by application of political pressure and threats of political sanctions to cancel its contracts with Plaintiff and to prevent Plaintiff from expressing his views to CLA members." Second Amended Complaint p 37 (emphasis added). After describing how the Wiesenthal defendants used their political clout to get him kicked out of the CLA conference,[3] McCalden gives his first and only hint as to what he is talking about when he alleges threats of violence: "[The Wiesenthal defendants] pressured Defendant CLA to cancel its contracts with Plaintiff by threatening and organizing a demonstration which [they] knew and intended would create a reasonable probability of property damage and of violence." Id. p 32 (emphasis added).
 
 
 74
 By letting McCalden proceed with a lawsuit that hinges on this allegation, the panel holds that a political organization can be sued for extortion on the basis of statements about a demonstration it intends to conduct at some time in the future. This is astonishing in light of Brandenburg, which held that a state may not prohibit "advocacy of the use of force or of law violation except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action." 395 U.S. at 447, 89 S.Ct. at 1829.
 
 
 75
 Since Brandenburg, the Supreme Court has given us more precise guidance in NAACP v. Claiborne Hardware Co., 458 U.S. 886, 102 S.Ct. 3409, 73 L.Ed.2d 1215 (1982). A local branch of the NAACP and concerned black citizens engaged in a boycott of white-owned stores to protest racial inequality. Charles Evers, one of the NAACP leaders, "stated that boycott violators would be 'disciplined' by their own people and warned that the Sheriff could not sleep with boycott violators at night." Id. at 902, 102 S.Ct. at 3420. Evers was also quoted as saying: "If we catch any of you going in any of them racist stores, we're gonna break your damn neck." Id. The Court held that a politically motivated boycott was protected by the First Amendment, even where the boycott organizers made statements that might otherwise sound like threats of violence.
 
 
 76
 Public demonstrations often carry with them the risk of violence. A large group of individuals, united by a common cause and motivated by strong emotions, can get out of control, causing property damage or injury. This is a risk we endure as part of life in a free society; it is not a sufficient reason--and I hope it never will become one--to stifle concerted public expression. If the propensity of large groups of angry people to harm property (and sometimes each other) is sufficient to give the target a cause of action against the organizers of the protest, we will have done much to silence the "vehement, caustic, and sometimes unpleasantly sharp attacks" heretofore protected by the First Amendment. See Sullivan, 376 U.S. at 270, 84 S.Ct. at 721.
 
 
 77
 What the Supreme Court recognized in Claiborne Hardware and Brandenburg is that strongly held political views engage the emotions as well as the intellect, and that the participants will often make statements that--taken out of context--sound a lot like threats of violence. "Strong and effective extemporaneous rhetoric cannot be nicely channeled in purely dulcet phrases." Claiborne Hardware, 458 U.S. at 928, 102 S.Ct. at 3434; see also id. at 927, 102 S.Ct. at 3433 ("mere advocacy of the use of force or violence does not remove speech from the protection of the First Amendment") (emphasis in original). As Judge Easterbrook has explained, "[c]ases such as [Brandenburg ] and [Claiborne Hardware ] hold that a state may not penalize speech that does not cause immediate injury." American Booksellers Ass'n, Inc. v. Hudnut, 771 F.2d 323, 333 (7th Cir.1985), affirmed, 475 U.S. 1001, 106 S.Ct. 1172, 89 L.Ed.2d 291 (1986).[4]
 
 
 78
 In a belated amendment to its opinion, the panel majority brushes aside Brandenburg and Claiborne Hardware as cases "involv[ing] public speeches advocating violence, not privately communicated threats of violence as are alleged here." Majority at 1222. My colleagues read these cases far too parsimoniously. What matters for purposes of the First Amendment is not whether the statements are uttered in public or in private, but whether--on the basis of what is alleged in the complaint--the speech in question can fairly be characterized as extortion. Cf. Watts v. United States, 394 U.S. 705, 707, 89 S.Ct. 1399, 1401, 22 L.Ed.2d 664 (1969) (per curiam) (reversing conviction for hyperbolic statement about shooting President Johnson: "What is a threat must be distinguished from what is constitutionally protected speech.").[5] Where the lawsuit grows out of a political dispute, Claiborne Hardware teaches that we must be extremely chary of letting one side characterize the other side's angry, sometimes menacing, statements as threats of violence actionable under state law. The political context of the statements matters a great deal.
 
 
 79
 The context here is framed by plaintiff's complaint. Defendants are the American Jewish Committee, the Simon Wiesenthal Center and Rabbi Marvin Hier: two organizations and an individual deeply committed to a political cause--remembrance of the Holocaust and its horrors--not back-alley thugs. Their statements were aimed at achieving a political objective, not exacting protection payments. Read in its entirety, not by plucking phrases out of context, McCalden's complaint alleges nothing more than the type of "uninhibited, robust, and wide-open" debate on public issues the First Amendment protects. See Sullivan, 376 U.S. at 270, 84 S.Ct. at 721.[6] By dismissing Brandenburg and Claiborne Hardware in a few scant phrases, my colleagues deliver a body blow to the principle that "speech on public issues occupies the 'highest rung of the hierarchy of First Amendment values,' and is entitled to special protection." Connick v. Myers, 461 U.S. 138, 145, 103 S.Ct. 1684, 1689, 75 L.Ed.2d 708 (1983) (quoting Claiborne Hardware, 458 U.S. at 913, 102 S.Ct. at 3425).
 
 Conclusion
 
 80
 No one disputes McCalden's right to say his piece, repugnant though his message be. The federal courts have a long and proud tradition of protecting the right of individuals with unpopular points of view to express themselves publicly even where this subjects onlookers to intense discomfort, even anger. More than a decade ago, for example, neo-Nazis were allowed to march through the streets of Skokie, Illinois, raising a nationwide furor. See Samuel Walker, In Defense of American Liberties: A History of the ACLU 323-31 (1990). See also Texas v. Johnson, 491 U.S. 397, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989) (flag burning); Wooley v. Maynard, 430 U.S. 705, 97 S.Ct. 1428, 51 L.Ed.2d 752 (1977) (covering up patriotic motto on license plate); Cohen v. California, 403 U.S. 15, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971) (profane political slogan). The discomfort and anger such speech generates is often a crucial part of the message, because effective political advocacy seeks to arouse the emotions, not merely the intellect. As the Supreme Court noted in Johnson: " '[Free speech] may indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger.' " 491 U.S. at 408-09, 109 S.Ct. at 2541 (quoting Terminiello v. Chicago, 337 U.S. 1, 4, 69 S.Ct. 894, 896, 93 L.Ed. 1131 (1949)). This is all as it should be.[7]
 
 
 81
 Surely, however, we may not withhold the same privilege of uninhibited, emotionally charged expression from the targets of McCalden's attack. Those who carry the mark of Auschwitz tattooed on their forearms, or who survived Treblinka, Dachau or Buchenwald; who were hunted down like animals in the streets of Warsaw; who saw loved ones perish during Kristallnacht or in frozen boxcars on their way to the death camps that are the shame and horror of modern times--they cannot be expected to react calmly, with deliberation, with gentility to one who would tarnish the memory of those butchered in the Holocaust by pretending the whole thing never happened. See Alan M. Dershowitz, Chutzpah ch. V (1991).[8] Surely their anger, their disgust, their anguish also has a protected place in the wide-open arena of our public discourse. To let plaintiff use a state civil rights statute (and possibly a federal one as well) to punish these defendants for threatening to hold a demonstration voicing their righteous indignation is not only a perversion of those civil rights laws, it is also a devaluation of the precious rights granted all of us by the First Amendment.
 
 
 82
 Because I believe the court is perpetrating a grave injustice by allowing this unfortunate precedent to be enshrined as the law of the circuit, I respectfully dissent from the refusal to rehear this case en banc.
 
 
 83
 REINHARDT, Circuit Judge, dissenting from the order rejecting the suggestion for rehearing en banc.
 
 
 84
 I join in Judge Kozinski's excellent dissent and agree fully with his analysis and comments. I write separately only in order to emphasize four points, and to add a few observations.
 
 
 85
 First, this appeal involves circumstances and issues that are similar in many respects to those in New York Times v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). Here, as there, a tort suit arises in the context of a bitter political dispute that pits the just against the unjust. Here, as there, the political dispute generates the strongest of emotions among the victims of racial or religious persecution. Here, as there, the objective of the litigation is to penalize those victims for engaging in first amendment conduct. Far more important, however, in both cases the fundamental legal principle involved, and the fundamental lesson to be learned, are the same: Whenever political discourse--whether in the form of an advertisement in the New York Times criticizing the treatment of blacks by Southern officials or a communication to the California Library Association (CLA) threatening a forceful and disruptive demonstration because of the participation of Holocaust revisionists in a CLA exhibit--is the basis for a lawsuit, the courts have a constitutional duty to ensure that the litigation does not become the instrument by which legitimate political speech or activity is stifled.
 
 
 86
 Second, because the plaintiff seeks to impose liability for speech, his complaint must be subjected to exacting scrutiny. Speech may be chilled not only by an award of damages but also by simply allowing a case to go to trial. See, e.g., Time, Inc. v. Hill, 385 U.S. 374, 389, 87 S.Ct. 534, 543, 17 L.Ed.2d 456 (1967) ("Fear of large verdicts in damage suits for innocent or merely negligent misstatement, even fear of the expense involved in their defense, must inevitably cause publishers to 'steer ... wider of the unlawful zone.' ") (quoting Sullivan, 376 U.S. at 279, 84 S.Ct. at 725) (emphasis added); cf. American Federation of Labor v. Swing, 312 U.S. 321, 325, 61 S.Ct. 568, 569, 85 L.Ed. 855 (1941) ("Since the case clearly presents a substantial claim of the right to free discussion and since, as we have frequently indicated, that right is to be guarded with a jealous eye, it would be improper to dispose of the case otherwise than on the face of the decree.") (citations omitted). Speech will inevitably be chilled if vague and conclusory allegations of threats suffice to allow a complaint to survive a motion to dismiss. For this reason, the Constitution imposes more exacting standards at every stage of a lawsuit implicating protected activities.
 
 
 87
 To survive a motion to dismiss, a complaint that seeks to attach liability to speech must include allegations far more specific than would be necessary in the ordinary civil case. See Franchise Realty Interstate Corp. v. San Francisco Local Joint Executive Board of Culinary Workers, 542 F.2d 1076, 1082-83 (9th Cir.1976) (holding that "in any case ... where a plaintiff seeks damages or injunctive relief, or both, for conduct which is prima facie protected by the First Amendment, the danger that the mere pendency of the action will chill the exercise of First Amendment rights requires more specific allegations than would otherwise be required"), cert. denied, 430 U.S. 940, 97 S.Ct. 1571, 51 L.Ed.2d 787 (1977); accord, Hydro-Tech Corp. v. Sundstrand Corp., 673 F.2d 1171, 1177 n. 8 (10th Cir.1982). The content, manner, and setting of the offending speech must be pled with specificity in order to allow a court to determine whether the alleged speech is protected under the first amendment. Yet the majority in McCalden never mentions, let alone applies, this heightened standard. In fact, the majority never acknowledges the potential for chilling the defendants' first amendment rights that is inherent in allowing litigation to go forward on the basis of vague complaints alleging tortious speech. The majority's routine treatment of the plaintiff's complaint--as if the action involved nothing more than a dispute over a bill of lading--is at odds with the last thirty years of first amendment jurisprudence and is reason enough to hear this case en banc.
 
 
 88
 Third, the majority has created an artificial and erroneous distinction between public and private speech. The majority does not go so far as to suggest that the intended demonstration itself would have been constitutionally unprotected. Nor does the majority find that, under Brandenburg v. Ohio, 395 U.S. 444, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969) and NAACP v. Claiborne Hardware Co., 458 U.S. 886, 927, 102 S.Ct. 3409, 3433, 73 L.Ed.2d 1215 (1982), a public speech or press conference announcing the planned demonstration would be "directed to inciting or producing imminent lawless action and ... likely to incite or produce such action," 395 U.S. at 447, 89 S.Ct. at 1829, and therefore constitutionally unprotected. On the contrary, it appears from the majority opinion that my colleagues recognize that if defendants Rabbi Hier, the Simon Wiesenthal Center, and the American Jewish Committee had notified defendant CLA of their intentions by means of a public communication, the conduct would be protected and dismissal of the complaint would be required. However, the majority concludes that because the defendants[1] allegedly chose to communicate with the CLA in private their otherwise-protected speech is stripped of its constitutional safeguards. This puzzling, and erroneous, conclusion results from the majority's reasoning that "[p]rivately communicated threats have traditionally been punishable where they have 'a reasonable tendency to produce in the victim a fear that the threat will be carried out.' " Amended Majority Opinion at 1222 (quoting Wurtz v. Risley, 719 F.2d 1438, 1441 (9th Cir.1983)). Yet the first amendment exception discussed in Wurtz has no applicability whatsoever to the facts of McCalden.
 
 
 89
 It is true that private threats may give rise to criminal or civil liability. So may public threats. The significance of the public-private distinction is that under certain circumstances private threats are more likely to give rise to a reasonable fear that the threat will be carried out. In this case, however, the public-private distinction is without constitutional validity, as well as entirely irrelevant. The principal issue in this case is not whether the recipient of the threat, the California Library Association, had a reasonable fear that the threat would be carried out. The principal issue before us--the principal issue on which the majority goes astray--is whether the alleged threat, a threat to hold a public demonstration, is the type on which liability may be founded. Our primary concern must be with the content of that threat, not with whether it was made publicly or privately. If the content of the speech is protected, that is the end of our inquiry. See generally Simon & Schuster, Inc. v. Members of the New York State Crime Victims Board, --- U.S. ----, ----, 112 S.Ct. 501, 512-15, 116 L.Ed.2d 476 (U.S. Dec. 10, 1991) (Kennedy, J., concurring in the judgment).
 
 
 90
 Fourth, the first amendment limits the state's power to define words as "threats" and to impose civil liability for their utterance. Under the first amendment, a state may not punish as a threat words that announce an intention to engage in constitutionally protected conduct. In Wurtz, the court was considering a threat of rape. Rape, it goes without saying, is quintessential criminal conduct--hardly a matter for constitutional protection--and it is not surprising that liability may attach to speech used to instill a fear of such conduct. The "threat" in McCalden was to engage in first amendment activity; specifically, to hold a political demonstration. The threat to engage in political activities is protected by the Constitution. The Constitution not only protects the right to hold political demonstrations, it protects the right to tell others of an intention to hold one--and it protects the right to tell them in private as well as in public. The exception the majority relies on--an exception used primarily to allow prosecution for extortion--is for speech that threatens unlawful conduct, speech that threatens the kind of conduct that takes place behind closed doors or in dark alleyways, speech that under the Constitution may be silenced. Such an exception has absolutely no applicability to the case of a threatened political demonstration.
 
 
 91
 The threat to conduct a demonstration does not lose its constitutional protection because demonstrations generally, or this demonstration in particular, may be disruptive or likely to result in property damage, and the speaker communicates this fact to the public at large, or to the group at which the demonstration is aimed. Contrary to the McCalden majority's view, the lesson of Brandenburg and Claiborne Hardware is not that public speeches are somehow less threatening than private communications and so can be tolerated even when private communications cannot.[2] Whether the defendants informed the CLA of their intention to hold a demonstration by means of a public press conference or a private communication, the CLA would "get the message" just as the boycott violators in Claiborne Hardware would have gotten the message whether Charles Evers gave his warning through newspaper ads, at a press conference, or in mailings sent to all the members of local churches or the NAACP. The proper lesson of the Supreme Court cases is that, in the midst of a heated political debate, strong words warning of strong action are normal and healthy, and tolerance of them is necessary if a robust public discourse is to be maintained.
 
 
 92
 Throughout our history, we have experienced demonstrations that have been disorderly and caused damage. Some of our most important political demonstrations--the Boston Tea Party, the Cooper Union labor rally, the Ford Motor Company strikes, the Berkeley free speech demonstrations, and the Vietnam War protests--have been marked by disruptive tactics and even violence. Yet these demonstrations caused the public to confront the underlying political issues and as a result, in many cases, turned the course of our nation's future. The recent unruly political protests directed against California's Governor Wilson in response to his veto of a gay rights bill are simply the latest reminder that political demonstrations are often not quiet, orderly, or anemic. We have come to regret those instances--such as the Tompkins Square labor demonstration, the I.W.W.'s free speech protests in San Diego and Everett, Washington, the Bonus Expeditionary Force's march on Washington, and the anti-war protests at Kent State--in which the fear of disorder was used to justify the suppression of free speech. The lesson of our history is that vituperative language and disruptive conduct are frequently normal elements of robust political controversy. We must be wary of direct attempts to suppress that form of political expression through the use of injunctions or criminal proceedings, and we must be equally wary of permitting indirect suppression of such expression by means of tort and other civil actions.
 
 
 93
 The Supreme Court has held that the first amendment protects speech far more violent and threatening that anything alleged by the plaintiff here.[3] The Court has reminded us that "[s]trong and effective extemporaneous rhetoric cannot be nicely channeled in purely dulcet phrases." Claiborne Hardware, 458 U.S. at 928, 102 S.Ct. at 3434. The rules regarding demonstrations are not those of Emily Post, and conduct that would be inappropriate in a parlor is routinely tolerated as a part of a political protest. When a political controversy generates strong emotions and threatens to become unruly, there is a better solution than silencing the demonstrators--the government must keep the peace without stifling the debate. See Laurence H. Tribe, American Constitutional Law § 12-10, at 852 (2d ed. 1988).
 
 
 94
 To advise the target of a planned political demonstration that the event is likely to result in disruption and property damage is, in many instances, simply to state the obvious. Certain types of constitutionally protected demonstrations involving highly emotional, divisive or inflammatory issues are inevitably going to be less peaceful than might be desirable in an ideal society. Demonstrations by Holocaust survivors against Holocaust revisionists clearly fall in this category. Yet, such demonstrations are entitled to full constitutional protection. Certainly, the statement that a political demonstration will be held cannot subject the organizers to liability; nor can the fact that a truthful warning is given that, in view of the nature of its underlying dispute, disruption and property damage may well result.
 
 
 95
 * * * * * *
 
 
 96
 Viewed in the context of the bitter political controversy which underlies this lawsuit, and evaluated in the light of the four points I have just emphasized, it is apparent that the plaintiff's complaint fails to state a claim. My colleagues admit that even liberally construed, the complaint contains just a single allegation of a specific threat. See Amended Opinion at 1221 ("Liberally construed, the complaint contains one allegation of a specific threat."). That allegation is that three defendants, Rabbi Hier, the Simon Wiesenthal Center, and the American Jewish Committee, informed defendant CLA that their "Annual Conference would be disrupted, there would be damage to property and the CLA would be 'wiped out.' " See id. This specific allegation is supplemented by a more general charge that the disruption and consequent damage would result from "a demonstration that [the three defendants] knew and intended 'would create a reasonable probability of property damage and of violence against Plaintiff and members of Defendant CLA.' " Id. (quoting the Plaintiff's complaint). According to the majority, this was sufficient to establish a threat to the plaintiff because "it is reasonable to infer that any property damage or injury threatened could be directed against [the plaintiff], because the allegations clearly link the alleged threat to an intent to disrupt [the plaintiff's] exhibit and program." Id. In short, the majority's construction of the complaint is that it alleges that the three defendants told the CLA that they intended to hold a political demonstration to protest the CLA's choice of conference participants, that this demonstration would cause disruption and property damage, and that some of this damage might be suffered by the plaintiff.
 
 
 97
 Even under this construction, the complaint does not allege any actions by the defendants that are not protected by the first amendment. When viewed in the context of the overall dispute, the threat to "wipe out" the defendant California Library Association is pure hyperbole and does not rise to the level necessary to sustain the plaintiff's cause of action. See Cafeteria Employees Union, Local 302 v. Angelos, 320 U.S. 293, 295, 64 S.Ct. 126, 127, 88 L.Ed. 58 (1943) (holding that state may not hold a union liable for "loose language or undefined slogans that are part of the conventional give-and-take in our economic and political controversies--like 'unfair' or 'fascist' "). Similarly, the allegation that the defendants "knew and intended [to] create a reasonable probability ... of violence" adds nothing. This allegation must be read in light of the more specific allegations that the three defendants threatened to "disrupt" the CLA's meeting and that this would cause a reasonable probability of "damage to property." As used in the complaint, "violence" is a conclusory term. It must be read as referring back to the specific charge that the defendants threatened and intended a disruptive demonstration with the attendant risk of property damage. The term itself adds nothing to those specific charges. There are no allegations of threats of personal violence directed at particular individuals and there is nothing in the complaint to suggest that what was threatened was anything more than what I have previously described as the normal incidents of a highly emotional and volatile political protest. And while such a threat, as explained earlier, may justify the deployment of sufficient law enforcement personnel to maintain the peace, it may not serve as the basis for a complaint for damages. Political demonstrations may not be banned because they are likely to be disruptive or result in property damage; and, even more so, a threat to hold such a demonstration cannot justify the imposition of civil or criminal liability. The interests of society are sufficiently preserved by adequate policing and the punishment of any unprotected conduct that actually occurs.
 
 
 98
 Moreover, the plaintiff's complaint is far too vague to survive a motion to dismiss. Even the majority's "one allegation of a specific threat" fails to meet the heightened standard of specificity required by Franchise Realty. Although federal appellate courts have had few occasions on which to develop that standard, the California courts have established detailed pleading requirements for complaints alleging tortious speech. Under California law, when a plaintiff seeks damages for another's words, those words "must be specifically identified, if not pleaded verbatim, in the complaint." Kahn v. Bower, 232 Cal.App.3d 1599, 284 Cal.Rptr. 244, 252 n. 5 (1991); 5 B. Witkin, California Procedure § 688, at 140 (3d ed. 1985).[4] When the words are ambiguous, what matters is how the recipient of the threat, here the CLA, understood them, and extrinsic circumstances must be pleaded to demonstrate that the words are "fairly susceptible" to an unprotected interpretation and that they were so understood by the recipient. See 5 B. Witkin, Summary of California Law § 493, at 580-81 (9th ed. 1988).
 
 
 99
 The specific allegation at issue in McCalden is that the three defendants "contacted a representative of Defendant CLA and informed him that if [its agreements with the plaintiff] were not cancelled, Defendant CLA's 1984 Annual Conference would be disrupted, there would be damage to property and the CLA would be 'wiped out.' " This allegation gives little indication of the actual words alleged to constitute a threat, the manner in which the words were communicated, or the setting in which the communication took place. It does not even state whether the words were oral or written (although in this case we may reasonably assume the former). Yet, the merits of a claim based on speech may depend upon the phrasing, manner, and context of the alleged communication. See, e.g., Old Dominion Branch No. 496 v. Austin, 418 U.S. 264, 285-87, 94 S.Ct. 2770, 2781-82, 41 L.Ed.2d 745 (1974) (holding that, when used in the context of a labor dispute, the epithet "scab" may not serve as the basis for a cause of action under state libel law); Greenbelt Cooperative Publishing Ass'n v. Bresler, 398 U.S. 6, 13-15, 90 S.Ct. 1537, 1541-42, 26 L.Ed.2d 6 (1970) (same for the use of the term "blackmail" to characterize the negotiating position of one side in a heated political debate). Because the complaint fails to specify these matters, a court could not determine that it states a claim upon which relief may be based, even aside from all its other infirmities. Nor does the plaintiff's allegation that the three defendants "contacted a representative of Defendant CLA and informed him" of the intended demonstration suggest that the setting was in any way threatening--let alone specify that the "threat" was made in private. Under the pleading requirements applicable in first amendment cases, there is simply no basis for the majority's conclusion that the plaintiff has pled "privately communicated threats of violence" that have " 'a reasonable tendency to produce in the victim a fear that the threat will be carried out.' " Amended Opinion at 1222 (quoting Wurtz v. Risley, 719 F.2d 1438, 1441 (9th Cir.1983)).
 
 
 100
 In summary, there are many errors in the majority's opinion in McCalden, a number of which would warrant hearing the case en banc. The majority fails to apply the appropriate pleading requirements for complaints seeking to penalize speech. It fails to consider the context of political controversy in which the alleged words were spoken and as a result erroneously extends an exception to the first amendment for criminal threats to speech announcing a political demonstration. It fails to recognize the practical realities of our constitutional commitment to free expression--that angry rhetoric and the venting of strong emotions are often accompanied by a degree of disruption and even property damage, and that it is far better to tolerate the possibility of such demonstrations than to discourage or prohibit political protest. Nor does the majority appear to recognize that the threat of a demonstration is even further removed from unprotected activity than the act itself--because the threat of political protest is speech in its purest form. The result of these errors is to subject those engaged in political debate to the possibility of prolonged and expensive court battles and to allow litigants to use the courts to silence political speech rather than protect it. When the defendants threatened to conduct a political demonstration, and thereby purportedly convinced the California Library Association to reject the Holocaust revisionists' participation in its conference, they were simply announcing their intent to exercise their first amendment rights. Allowing McCalden to invoke the power of the courts in order to seek monetary damages does violence to the first amendment protection for free speech. I very much regret our decision not to hear this case en banc.
 
 
 101
 * * * * * *
 
 
 102
 Any discussion of the free speech issue in the present case would be incomplete if it failed to take note of the fundamental irony in the parties' respective positions. Here, defendants, the victims of religious persecution and intolerance, sought to shut off the speech of those who would deny the reality of their suffering.[5] In my opinion, this demonstrated exceedingly poor judgment on defendants' part, as well as a myopic view of our democratic system. The episode at Skokie should have taught us all that in the long run it does not pay to try to silence speech we find odious, if only because the result frequently is far more publicity for the point of view we are seeking to suppress.
 
 
 103
 There are of course more fundamental reasons why we should not stifle offensive speech. "Free speech is life itself." Salman Rushdie (quoted in N.Y. Times, December 12, 1991, at A1); see, also, Sullivan, 376 U.S. at 725 n. 19, 84 S.Ct. at 725 n. 19 ("Even a false statement may be deemed to make a valuable contribution to public debate, since it brings about 'the clearer perception and livelier impression of truth, produced by its collision with error.' ") (quoting John S. Mill, On Liberty 15 (Oxford 1947) (1859)); Abrams v. United States, 250 U.S. 616, 630, 40 S.Ct. 17, 22, 63 L.Ed. 1173 (1919) (Holmes, J., dissenting) (discussing the "marketplace of ideas"). The wisdom of Mill, Holmes, Brennan, and Rushdie should be sufficient to motivate all of us to tolerate speech gladly, even when it appears to be harmful. Simply because we have the constitutional right to attempt to cause businesses, organizations, or institutions to limit speech, to cancel scheduled programs, to withdraw art, to refuse to show motion pictures is no justification for doing so. Democracy suffers when that form of private censorship occurs. Almost everything in our society is offensive to some individual or group. If we permit the silencing of whatever is distasteful to some, our life in this nation will be far less rich and full. New ideas are frequently disturbing--at least until we become used to them. They are not likely to flourish if we chop them off at the inception, simply because some persons or group is offended. The right or wrong of speech is simply irrelevant to the question whether it should be heard. We must have enough confidence in democracy to believe that truth will prevail, or we will soon find ourselves without ideas at all. I would hope that these fundamental principles would guide the defendants', indeed all of our, actions in the future. Nevertheless, unwise as the actions of Rabbi Hier, the Simon Wiesenthal Center, and the American Jewish Committee may have been, because their actions were conducted by protected means, they had a right, under our Constitution, to engage in them--and they must neither be punished nor sanctioned for doing so.
 
 
 104
 NOONAN, Circuit Judge, dissenting from the order rejecting the suggestion for rehearing en banc:
 
 
 105
 While I am in general agreement with the dissents of Judge Reinhardt and Judge Kozinski, it does not seem to me necessary to go beyond the construction of the complaint read in the light of the First Amendment. Coon v. Joseph, 192 Cal.App.3rd 1269, 237 Cal.Rptr. 873 (1987) holds that a threat against another person cannot be construed as a threat against the complainant. No more is alleged here. As the dissents of Judge Reinhardt and Judge Kozinski make clear, an indulgent standard of pleading is inappropriate where the plaintiff is seeking damages for the speech of the defendant. I believe the case should have been taken en banc and dissent from the failure to do so.
 
 
 
 *
 By this court's order of July 15, 1991, Viviana McCalden was substituted as plaintiff-appellant for David McCalden
 
 
 [1]
 Fed.R.Civ.P. 58 states in relevant part: "Every judgment shall be set forth on a separate document. A judgment is effective only when so set forth and when entered as provided in Rule 79(a)."
 
 
 [2]
 Although a separate judgment is required for the time limit to appeal to begin running, it does not follow that a separate judgment is necessary to create appellate jurisdiction; the parties may waive the requirement, avoiding the " 'pointless exercise of dismissing the appeal and waiting for the district court clerk to enter a separate judgment.' " Allah v. Superior Court, 871 F.2d at 890 n. 1 (quoting Vernon v. Heckler, 811 F.2d 1274, 1276-77 (9th Cir.1987)); Bankers Trust Co. v. Mallis, 435 U.S. at 385, 98 S.Ct. at 1120
 
 
 [3]
 We express no opinion as to the elements of the related tort of interference with prospective economic advantage. See, e.g., Garter-Bare Co. v. Munsingwear Inc., 723 F.2d 707, 716 (9th Cir.1984) (quoting Rickards v. Canine Eye Registration Foundation, Inc., 704 F.2d 1449, 1456 (9th Cir.1983)) (identifying as essential element of tort of interference with prospective economic advantage as "some identifiable pecuniary or economic benefit [that] must accrue to [defendant] that formerly accrued to [plaintiff]"); see also Pacific Gas, 50 Cal.3d at 1126, 270 Cal.Rptr. 1, 791 P.2d 587 (noting differences between these two torts)
 
 
 [4]
 It is clear, of course, that none of the appellees can be liable for petitioning the Los Angeles City Council or for organizing a demonstration against McCalden. These activities are plainly protected by the First Amendment. See Evers v. County of Custer, 745 F.2d 1196, 1204 (9th Cir.1984); Brownville Golden Age Nursing Home, Inc. v. Wells, 839 F.2d 155, 159-60 (3d Cir.1988). Speech or conduct that falls outside the protection of the First Amendment, on the other hand, may expose appellees to liability for interference with contractual relations
 
 
 [5]
 Appellant's Brief, Addendum at 16
 
 
 [6]
 The only mention in the complaint of a threat conveyed to McCalden was the second-hand information that the CLA "had received threats of substantial disruption to the conference and to the property of other exhibitors should [McCalden's] program be allowed to be presented." E.R. 21 (emphasis added)
 
 
 [7]
 The statute reads, in relevant part:
 If two or more persons in any State or Territory conspire to go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws ... the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.
 
 
 [8]
 Defendant CLA was not named in this part of the complaint
 
 
 [9]
 The requirement that an actionable conspiracy must feature class-based animus was enunciated by the Supreme Court in Griffin v. Breckenridge, 403 U.S. 88, 102, 91 S.Ct. 1790, 1798, 29 L.Ed.2d 338 (1971). For the other elements of a Section 1985(3) action, none of which are treated here, see Griffin, 403 U.S. at 102-03, 91 S.Ct. at 1798-99
 
 
 [10]
 See United Bhd. of Carpenters & Joiners, Local 610 v. Scott, 463 U.S. 825, 103 S.Ct. 3352, 77 L.Ed.2d 1049 (1983) (limiting types of class-based animus fulfilling element of Section 1985(3) claims); Griffin, 403 U.S. 88, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971) (setting forth original requirement of class-based animus)
 
 
 [11]
 Appellees urge that we must reach the merits of whether appellant has stated a § 1983 claim, citing Helvering v. Gowran, 302 U.S. 238, 245, 58 S.Ct. 154, 158, 82 L.Ed. 224 (1937). While they are correct that an appellate court must affirm a district court's decision if correct, even though the district court's reasoning is flawed, we have already held that the district court's judgment must be reversed in part and the case remanded for further proceedings. Thus, the rationale for the Helvering rule that it "would be wasteful to send a case back to a lower court to reinstate a decision which it had already made," SEC v. Chenery Corp., 318 U.S. 80, 88, 63 S.Ct. 454, 459, 87 L.Ed. 626 (1943), is inapplicable. Because the § 1983 claims here may involve constitutional issues that have not been adequately briefed on appeal, we exercise our discretion to allow the district court to consider these claims in the first instance. See I.A. Durbin, Inc., v. Jefferson Nat'l Bank, 793 F.2d 1541, 1552-53 (11th Cir.1986) (having determined that district court's dismissal of some claims was improper, court refused to reach merits of other constitutional claims and merely pointed out district court's improper reasoning, because constitutional issues were inadequately briefed, and because of general principle against unnecessary decision of constitutional questions.)
 
 
 [1]
 The July 30, 1987 Order stated, in relevant part:
 "By this order [the March 24, 1987 order dismissing McCalden's fourth claim], the court dismissed with prejudice all of plaintiff's actions against all of the defendants, except for the City of Los Angeles.
 Although the above orders dismissing the action with prejudice as to certain claims and certain defendants may not be deemed final without certification pursuant to Rule 54(b), an order of dismissal may be treated as final if the remaining claims have been finalized by subsequent developments.... Here, subsequent to the issuance of the orders of February 6 and March 24 dismissing certain claims and certain defendants, plaintiff voluntarily submitted a stipulation entered into with the remaining defendant, the City of Los Angeles to dismiss the action pursuant to F.R.Civ.P. 41(e). This court signed the stipulation on March 26, 1987. The clerk's office filed the order on March 30, 1987 and entered the order on March 31, 1987. Therefore, after the issuance of this order, there were no remaining claims nor defendants to the action.
 Although plaintiff would not have been able to appeal his own voluntary dismissal of the last defendant, plaintiff could and should have filed his notice of appeal with respect to the court's orders of February 6 and March 24th shortly after he filed the stipulation dismissing the remaining claims and defendant in this action."
 
 
 [1]
 McCalden also sued the Library Association, the City of Los Angeles and the hotel in which the meeting was held; my concern here, however, is only with the Wiesenthal defendants
 
 
 [2]
 Commenting on a closely analogous situation, Professor Tribe notes that "more is needed than a ritual incantation of the word 'incitement' before civil or criminal damages may be assessed on the basis of speech." Laurence H. Tribe, American Constitutional Law 849 n. 58 (2d ed. 1988)
 
 
 [3]
 Wiesenthal's methods, as described at length in the complaint, included meeting with Library Association officials, seeking the support of the city council, renting a conference room next to McCalden's and disseminating information about McCalden's program to other Jewish organizations. Id. pp 22-39
 
 
 [4]
 Judge Easterbrook also noted:
 Much speech is dangerous. Chemists whose work might help someone build a bomb, political theorists whose papers might start political movements that lead to riots, speakers whose ideas attract violent protesters, all these and more leave loss in their wake. Unless the remedy is very closely confined, it could be more dangerous to speech than all the libel judgments in history.
 Id. at 333. Words my colleagues would do well to heed.
 
 
 [5]
 Writing for the Seventh Circuit en banc, Judge Posner interpreted Brandenburg, Claiborne Hardware, Watts and other Supreme Court cases to cover situations far more extreme than that here:
 If ... a new sect of religious fanatics announced that unless Chicagoans renounce their sinful ways it may become necessary to poison the city's water supply, or a newly organized group of white supremacists vowed to take revenge on Chicago for electing a black mayor, these statements, made by groups with no "track record" of violent acts, might well be privileged. Or suppose the leaders of a newly formed organization of Puerto Rican separatists went around Chicago making speeches to the effect that, if the United States does not grant Puerto Rico independence soon, it will be necessary to begin terrorist activities on the mainland United States. These speeches could not, in all probability, be made the basis of a prosecution.
 Alliance to End Repression v. City of Chicago, 742 F.2d 1007, 1014 (7th Cir.1984) (en banc) (citations omitted). In light of Alliance to End Repression and Hudnut, there is little doubt this case would have come out differently had it been brought in the Seventh Circuit.
 
 
 [6]
 In achieving their objectives, defendants expressed their angry disagreement with plaintiff's point of view, and let others know they would be there to protest if McCalden were allowed to participate in the Library Association conference. This no doubt put pressure on the Library Association, which had every interest in avoiding a demonstration that would disrupt its proceedings. But threatening to disrupt an event because it features a speaker to whom protestors object is a common tactic, and has never been held to be actionable. See Alan M. Dershowitz, Taking Liberties 47-49, 166-68 (1988) (discussing hecklers and demonstrators)
 
 
 [7]
 Indeed, this is all as it must be. Were we to allow limitations on speech because it offends community sensibilities, we would eviscerate the anti-majoritarian protections of the First Amendment. See Martin H. Redish and Gary Lippman, Freedom of Expression and the Civic Republican Revival in Constitutional Theory: The Ominous Implications, 79 Cal.L.Rev. 267, 297-304 (1991); see generally Lee C. Bollinger, The Tolerant Society (1986)
 
 
 [8]
 Professor Dershowitz points out the profound significance of the Holocaust: "The Holocaust changed the nature of Judaism and of Jews forever. It changed the way Jews look at non-Jews, and vice versa. It changed the way every compassionate person views justice and injustice. It should challenge the faith of every thinking being." Id at 130. Wiesenthal's intense--and not particularly tolerant--reaction must be understood in light of this reality
 
 
 [1]
 There are a number of defendants in this case, including the City of Los Angeles and the Westin Bonaventure Hotel. However, for purposes of this dissent, whenever the term "defendants" is used without further identification it refers to the defendants who are alleged to have engaged in the threatening conduct--Rabbi Hier, the Simon Wiesenthal Center for Holocaust Studies, and the American Jewish Committee
 
 
 [2]
 The majority seems to misunderstand the import of the Claiborne Hardware Court's holding that "Charles Evers could not be held liable for [his] public speech, but ... individuals who 'engaged in violence or threats of violence ... may be held responsible for the injuries that they caused.' " Amended Opinion at 1222 (quoting Claiborne Hardware, 458 U.S. at 926, 102 S.Ct. at 3432). The distinction is not, as the majority asserts, between public and private speech. Instead, it is between a "threat" to conduct a boycott which the Court holds constitutionally-protected even though the sponsor made it clear that violence might well play a part (see note 3), and more specific, individual acts or threats of direct violent conduct which the Court states are unprotected
 
 
 [3]
 In Claiborne Hardware, the Supreme Court held that Charles Evers' speech was protected even though he "threatened" potential boycott violators by warning them that the sheriff would be unable to protect them from harm if they helped weaken the boycott by failing to live up to their agreement to participate:
 We intend to enforce [the boycott]. You needn't go calling the chief of police, he can't help you none. You needn't go calling the sheriff, he can't help you none. (That's right.) He ain't going to offer to sleep with none of us men, I can tell you that. (Applause) Let's don't break our little rules that you agreed upon here.
 458 U.S. at 938-39, 102 S.Ct. at 3439. It is worth noting that, though Evers' speech "threatens" boycott violators with harm, the harm threatened is one of the readily foreseeable consequences of a bitter and violently-contested political boycott.
 
 
 [4]
 Although this pleading requirement applies specifically to defamation claims, it is applicable to all claims implicating first amendment activity. As the Supreme Court made clear in Sullivan, the limitations of the first amendment are applicable whenever the effect of the litigation is the repression of expression; a cause of action under the Unruh Civil Rights Act--like any other cause of action--"can claim no talismanic immunity from constitutional limitations." 376 U.S. at 269, 84 S.Ct. at 720; see also, Blatty v. New York Times Co., 42 Cal.3d 1033, 232 Cal.Rptr. 542, 549, 728 P.2d 1177, 1184 (1986)
 
 
 [5]
 Because defendants prevailed below at the pleading stage, we do not know whether they actually uttered the threats they are alleged to have made. There is little doubt, however, that they sought to persuade the CLA that it should not permit the Holocaust revisionists' materials and program to be presented at the annual conference