**S & R METALS, INC.,**
**Plaintiff–Appellee,**

v.

**C. ITOH & CO. (AMERICA), INC.,**
**Defendant–Appellant.**

No. 87–5548.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Feb. 3, 1988.

Decided Oct. 21, 1988.

Carlos Solis, Kindel & Anderson, Los Angeles, Cal., for defendant-appellant.

Douglas L. Carden and John C. Gorman, Shapiro, Posell & Close, Los Angeles, Cal., for plaintiff-appellee.

Before HUG, BEEZER and KOZINSKI, Circuit Judges.

HUG, Circuit Judge:

C. Itoh & Co. (America), Inc. ("C. Itoh") appeals the judgment of the district court in favor of the plaintiff S & R Metals, Inc. ("S & R"). The district court held that S & R is entitled to revoke its acceptance of steel delivered under contract by C. Itoh. The court determined that S & R may return that steel to C. Itoh and C. Itoh is liable for damages, interest, and costs in the aggregate amount of $1,646,969.

## FACTS

C. Itoh is a steel trading company that buys and sells steel in bulk. S & R is a steel service center that buys steel in bulk and resells it in smaller amounts to manufacturers and others. In 1984, C. Itoh contracted to sell to S & R 5,500 metric tons of steel. The steel was to be conveyed in coils of varying widths and thicknesses, and it was all to be "commercial quality SAE 1010 milled edge" hot rolled steel. The steel was delivered to S & R at Long Beach Harbor in July, 1984 in 644 coils. S & R then transported the steel to its facility at its own expense. The parties do not dispute that S & R accepted delivery of the steel.

On December 21, 1984, S & R notified C. Itoh that S & R revoked acceptance of the steel that remained in S & R's inventory. S & R had sold about 35% of the steel it had received from C. Itoh. An S & R customer complained that steel sold by S & R failed to conform to the requirements for commercial quality SAE 1010 hot rolled steel. S & R traced the steel back to the C. Itoh shipment and confirmed its failure to conform. S & R stopped selling the C. Itoh steel, contacted C. Itoh, and then formally revoked acceptance.

The district court found that commercial quality SAE 1010 hot rolled steel must pass a "bend test" according to industry custom. This test requires that "the steel will bend flat upon itself in any direction at room temperature without visible cracks along the bend." Performing the bend test destroys or substantially harms the coil of steel being tested, and is expensive. The court found that it is not customary for a steel buyer to perform the bend test upon receipt of a delivery, and that a tendency of steel to fail the test is a latent defect not visible to the eye. Moreover, the court found that some of S & R's customers could use the steel in such a way as not to discover that the steel would fail the bend test. Steel that fails the bend test is not accepted as commercial quality SAE 1010 steel and is not usable for most ordinary purposes.

The steel about which S & R's customers complained was 14 gauge plain steel. Of the 5,500 metric tons of steel in the contested transaction, 1,360 tons are 14-gauge plain steel. Approximately half the coils of this type of steel failed the bend test. Nei-

ther party presented substantial evidence as to whether the remaining steel would pass the bend test. C. Itoh tested a few samples of 7–gauge steel which passed the test. S & R tested a few samples of various gauges which failed the test. The court found, however, that the samples were neither sufficiently numerous nor sufficiently random to provide for a conclusion about whether the steel other than 14–gauge plain steel satisfied the SAE 1010 commercial quality specifications. As for the 14–gauge steel, the court found that it failed the specifications.

From these findings of fact, the district court concluded that C. Itoh breached the sales contract by delivering nonconforming steel, that S & R accepted the delivery, and that S & R was entitled to revoke its acceptance of and return to C. Itoh all the C. Itoh steel that remained in its possession. The court awarded damages to S & R for the price of the remainder of the steel, the cost of shipping it from Long Beach Harbor to S & R's facility, the customary fee for storage of the steel, and interest at 7% on all of these elements from the date of revocation.

### Jurisdiction

Jurisdiction in the district court is based on the parties' diversity of citizenship and the amount in controversy, which is in excess of $10,000. 28 U.S.C. § 1332 (1982). Our jurisdiction over this appeal from the district court's final order is proper pursuant to 28 U.S.C. § 1291. Notice of appeal was timely filed. Fed.R.App.P. 4(a)(1).

### Standard of Review

We review the district court's findings of fact under the clearly erroneous standard. Fed.R.Civ.P. 52(a); *Roadway Express v. Jossy,* 853 F.2d 736, 738 (9th Cir.1988). "[W]e must accept the ... court's findings of fact unless we are left with the definite and firm conviction that a mistake has been committed." *Id.* at 738. We review the district court's construction and application of state law *de novo. Churchill v. F/V Fjord (In re McLinn),* 739 F.2d 1395 (9th Cir.1984) (en banc).

### Choice of Law

The substantive law of California governs this case. *See Fiorito Bros. v. Fruehauf Corp.,* 747 F.2d 1309, 1312 (9th Cir. 1984). "Our independent determination of state law should be based upon recognized sources that are available to the parties and that may be argued and contested before the district court as well as before the appellate court." *Id.* (quoting *In re McLinn,* 739 F.2d at 1400). We are bound by the law announced by the state's highest court. In the absence of such express guidance, we must interpret and apply the law as we predict the state's highest court would interpret and apply it. *Fiorito Bros.,* 747 F.2d at 1314.

### ANALYSIS

The material findings of fact are supported by evidence in the record and are not clearly erroneous. There is ample evidence that the steel was warranted to satisfy the requirements for Commercial Quality SAE 1010 steel, and that these requirements include passing the bend test. There is also evidence that a substantial portion of the 14–gauge steel failed this test and that this failure reflects a substantial defect. A breach of warranty is clear. We will not upset these findings.

Because S & R accepted the steel, its remedy lies in Cal.Com.Code § 2608 (West 1964), entitled "Revocation of Acceptance in Whole or in Part." That section states the following:

(1) The buyer may revoke his acceptance of a lot or commercial unit whose nonconformity substantially impairs its value to him if he has accepted it

(a) On the reasonable assumption that its nonconformity would be cured and it has not been seasonably cured; or

(b) Without discovery of such nonconformity if his acceptance was reasonably induced either by the difficulty of discovery before acceptance or by the seller's assurances.

(2) Revocation of acceptance must occur within a reasonable time after the buyer discovers or should have discovered the

ground for it and before any substantial change in condition of the goods which is not caused by their own defects. It is not effective until the buyer notifies the seller of it.

(3) A buyer who so revokes has the same rights and duties with regard to the goods involved as if he had rejected them.

*Id.*

S & R has satisfied the elements of section 2608. The court found that the defect in the 14-gauge steel substantially impaired its value to S & R. Moreover, if S & R had tested the remainder of the steel in order to determine whether it is also defective, the test would have substantially reduced the value of that steel. Yet, without performing the test, S & R cannot be confident that the quality of the remainder of steel is sufficiently high to allow its sale to S & R's customers. The court found that the defect was not discovered before acceptance because it is latent and difficult to discover and that revocation was within a reasonable time of discovery of the defect. S & R received the customer complaint regarding the C. Itoh steel on or about December 12, 1984. The parties exchanged samples, inspected the steel, and engaged in limited negotiations. Notice of revocation was dated December 21, 1984, only nine days after discovery.

Section 2608 states that if the elements required for revocation are satisfied, then the "buyer may revoke his acceptance of a lot or commercial unit." Cal.Com.Code § 2608(1) (West 1964). "Lot" is defined as "a parcel or a single article which is the subject matter of a separate sale or delivery, whether or not it is sufficient to perform the contract." Cal.Com.Code § 2105(5) (West 1964). We read these sections to permit S & R to revoke acceptance of the entire amount of C. Itoh steel still in its possession. "The code gives the buyer the option of exercising the power to revoke acceptance not only with respect to the entire delivery but also with respect to any lot or commercial unit." 4 R. Anderson, *Uniform Commercial Code* § 2-608.5 at 172-73 (3d ed. 1983) (footnote

omitted). *Accord* U.C.C. § 2-608 comment 7; J. White & R. Summers, *Uniform Commercial Code* 315 (2d ed. 1980).

■ C. Itoh argues that the provision pertaining to revocation of a lot operates only where goods are shipped in multiple deliveries and that S & R should not be able to revoke as to the entirety because it was shipped in a single delivery. C. Itoh contends that S & R may revoke only as to a "commercial unit," and it must prove a defect in any commercial unit whose acceptance it revokes. Commercial unit is defined as follows:

"Commercial unit" means such a unit of goods as by commercial usage is a single whole for purposes of sale and division of which materially impairs its character or value on the market or in use. A commercial unit may be a single article (as a machine) or a set of articles (as a suite of furniture or an assortment of sizes) or a quantity (as a bale, gross, or carload) or any other unit treated in use or in the relevant market as a single whole.

Cal.Com.Code § 2105(6) (West 1964). C. Itoh concludes that S & R's right to revoke does not extend beyond the 14-gauge steel because S & R has not proved a defect in any other steel.

This argument is not sound. We have found no support for such a restrictive reading of the code. If goods are shipped in a single lot, as here, then the right of revocation extends to the entirety. The commercial unit provision is included to protect a seller from having a buyer return *less* than a commercial unit. Return of less than a commercial unit would leave the seller with only components of a commercial unit, which would have severely reduced market value. *See Abbett v. Thompson,* 148 Ind.App. 25, 263 N.E.2d 733 (1970) (buyer could not keep some parts of a carwash machine and revoke acceptance of the rest because the entire machine was a commercial unit, and would have little value to the seller if incomplete). Because S & R did not revoke acceptance of less than any whole commercial unit, this provision is immaterial here.

■ Having established that S & R is entitled to revoke its acceptance of all the C. Itoh steel in its possession, we turn to the remaining issue, damages. The district court awarded S & R the purchase price of the revoked steel, the reasonable cost of transportation from Long Beach Harbor to S & R's facility, the reasonable cost of storage and handling, and 7% interest per annum on these amounts. C. Itoh contends that a contract clause excluding recovery for "special, indirect, or consequential damages" prevents S & R from recovering storage, handling, or interest charges.

This argument is directly refuted by code section 2715. That section defines incidental damages as including "expenses reasonably incurred in ... receipt ... and care and custody of goods...." Cal.Com.Code § 2715(1) (West 1964). Because consequential damages are defined in a separate subsection, there is no question that these expenses are distinct from consequential damages. Cal.Com.Code § 2715(2) (West 1964). It is also beyond cavil that storage and handling charges are included in expenses for "receipt ... and care and custody." Because the contract did not exclude incidental damages, it did not exclude storage and handling expenses. These were properly awarded.[1]

■ As for interest, we are directed by the code that "remedies ... shall be liberally administered to the end that the aggrieved party may be put in as good a position as if the other party had fully performed...." Cal.Com.Code § 1106(1) (West 1964). We have already determined that the underlying elements of damages awarded are appropriate. S & R will not "be put in as good a position" if it is denied recovery of interest. Therefore, we conclude that interest was properly awarded here.

For the foregoing reasons, the district court's judgment is AFFIRMED.

---

1. C. Itoh also argues that storage charges should not be assessed because S & R made no out-of-pocket payment for storage of the steel. However, S & R's storage at its own facility does not eliminate the expense. Evidence in the record supports the award.